**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

UNITED STATES OF AMERICA,

    **Plaintiff,**

          **v.**                    **CIVIL NO.** 08-337 (FAB)

JORGE A. DE CASTRO-FONT [1],

    **Defendant.**

**MEMORANDUM AND ORDER**

BESOSA, District Judge.

## I.  Introduction

On December 3, 2008, the United States submitted a motion notifying the Court that defendant Jorge A. De Castro-Font ("De Castro") had violated a condition of his bail for a second time, requesting an order revoking De Castro's bond, and requesting the issuance of an arrest warrant.  (Docket No. 117)  This motion was followed by a motion from the United States Probation Officer which also indicated that De Castro had violated a condition of his release again, requesting also that his bail be revoked.  (Docket No. 118)  This Court then entered orders for an arrest warrant to be issued and setting a bail revocation hearing.  (Docket Nos. 120 and 122)  The Magistrate Judge ordered De Castro detained pending the holding of the hearing.  (Docket No. 124)

At the close of the hearing, the Court ordered De Castro's bail revoked and ordered him detained.  (Docket No. 126)  This

Civil No. 08-337 (FAB)                                                    2

written opinion provides the Court's findings of fact and rationale for its decision.

## II.  Findings of Facts

### A.  Contacts with potential witnesses

Like other pretrial proceedings, bail hearings are "typically informal affairs, not substitutes for trial or even for discovery. Often the opposing parties simply describe to the judicial officer the nature of their evidence; they do not actually produce it." United States v. Acevedo-Ramos, 755 F.2d 203, 206 (1st Cir. 1985) (Breyer, J.)   Here, of course, the United States produced its evidence.

De Castro was indicted and arrested on October 2, 2008.  The Magistrate Judge ordered him released that same day.  The Order releasing De Castro contains the conditions of his release. Condition 7(j) of the "order setting conditions of release" provides as follows:

> The defendant shall avoid all contact, directly or indirectly, with any persons [sic] who are or who may become a victim or potential witness in the subject investigation or prosecution, including but not limited to: unless accompanied by counsel.

(Docket No. 13, p. 2) (emphasis supplied)

De Castro violated this provision a first time by contacting grand jury witness Linda Ayala-Bauzo ("Ayala"), an employee of De Castro's office at the Legislative Assembly of Puerto Rico, on

October 31, 2008.[1]  The United States Probation Officer filed a
motion notifying the Court of the contact on November 7, 2008.
(Docket No. 62)  The Court issued an order on November 18, 2008 in
which it found that De Castro had violated a condition of his bail
by contacting a potential witness (Ayala) via telephone without
counsel present, but the Court did not take any immediate remedial
action.  (Docket No. 88)

     At the December 4 revocation hearing, Ayala testified that she
was contacted on three occasions by De Castro since the government
began to investigate him.  (Tr. 4-8)  The first contact occurred
prior to the issuance of the indictment.  On that occasion, De
Castro called Ayala on her office phone.  (Tr. 6)  He called her
after the press reported that she had testified in federal court
before the Grand Jury.  (Tr. 6, 18)  In that call, Ayala confirmed
to De Castro that she had testified, and she told him, in response
to his question, that she did not say anything more before the
grand jury than what the press reported.

_____

     [1] It is unclear whether Ayala is an employee of De Castro's
Senate Office or of one of the offices of the Committees of which
he is the Chairman, but that is not germane here.  Ayala testified
that she was contacted by De Castro the Friday before the press
reported that a motion for recusal had been filed in the case.
(Dec. 4, 2008 Transcript at p. 7, hereinafter "Tr. 7")  The motion
for recusal was filed on Monday, November 3, 2008.  (Docket No. 55)
Also of note, the motion notifying the Court of the first violation
noted that an Assistant United States Attorney became aware of the
contact with Ayala on November 3, 2008.  (Docket No. 62)

The second and third occasions when De Castro contacted Ayala occurred on October 31, 2008. (Tr. 7) On both occasions De Castro contacted Ayala by telephone. During the first call, which constituted the violation of De Castro's condition of release notified to the Court on November 7, De Castro asked Ayala if she remembered whether Judge Besosa had visited "their" office.[2] (Id.) Later that same day, De Castro called Ayala again but that time he passed the phone over to defense counsel Lizarribar, who spoke briefly with Ayala. (Tr. 8)

Subsequent to De Castro's October 31 conversations with Ayala, his wife, Lissandra Delgado ("Delgado"), contacted other persons who are extortion victims and potential witnesses in the case. One of those persons, Orlando Mayendia-Diaz ("Mayendia"), testified that he has known De Castro for over twenty years and that he attended the wedding between De Castro and Delgado. (Tr. 10-11) At some point between November 17 and 24, while driving in his car, Mayendia received a call from Delgado that lasted for about five minutes. (Tr. 11) After asking about Mayendia's family and responding to his question concerning her parents, Delgado told Mayendia "we are having some problems; to see if you could help us." (Tr. 12) Mayendia understood this to be a request for economic assistance, although he noted when testifying that Delgado

---

[2] This information was to serve as a basis for the motion for recusal filed later. (Docket No. 55)

did not use the word "money."  (Id.)  This was the only time that Delgado has ever asked Mayendia for help.

Special Agent Ruben Marchand-Morales ("Marchand") testified at the bail revocation hearing concerning calls placed by Delgado to two additional persons who are extortion victims and potential witnesses, the Cabral brothers, Rolando and Miguel.  (Tr. 16-17) The morning of the bail revocation hearing, December 4, Marchand spoke with Rolando Cabral who informed him that Delgado had contacted him approximately two to three weeks before.  Rolando Cabral told Marchand that Delgado had contacted his brother Miguel as well.  (Tr. 16)  Rolando Cabral told Marchand that Delgado said she was calling to see if Rolando could help "them" finance their legal fees.  (Id.)  Rolando Cabral also told Special Agent Marchand that his brother Miguel had been contacted by Delgado, and that Miguel then contacted his attorney who advised him not to talk with Delgado again.  (Id.)

**B.   Victims and Potential Witnesses**

The indictment issued by the grand jury refers to victims and potential witnesses indirectly by assigning them a number and not using their names (i.e., "Person 1").  Nonetheless, the indictment includes certain information about those individuals that allows De Castro to identify them.  Three of these individuals to which the indictment refers, and who have become relevant to this decision, are "Person 7," "Person 9," and "Person 10."

The indictment identifies Person 7 as a co-owner of a water
processing and bottling enterprise operating in San Juan
(Mayendia).  (Docket No. 3, p. 7)  Among other things, the
indictment states that in or about 1996 De Castro requested that
Person 7 pay him approximately $500 a month.  (Docket No. 3,
Counts 1-20, p. 20-21)  From 1996 to 2008 Person 7 allegedly
provided De Castro with approximately $50,000 in cash payments.
(Id. at 21)  The indictment also alleges that in or about 2001,
Person 7 had trouble obtaining a permit from the Puerto Rico
Electric Power Authority ("PREPA") for the opening of a warehouse
facility until De Castro arranged a meeting between Person 7 and a
"high ranking official at PREPA." (Id. at 22)  The indictment also
alleges that on or about June 18, 2008, De Castro presented and
supported an amendment to a bill providing the specific language
that Person 7 needed to be in the bill, enable Person 7 to sell the
water processing business to a foreign corporation.  (Id. at 21)

As with Person 7, the indictment contains detailed information
concerning Persons 9 and 10.  The indictment identifies both
persons as the co-owners of a parking services company operating
throughout the island of Puerto Rico (the Cabral brothers).  (Id.
at 8)  It also alleges that Person 9 provided De Castro with
"regular" cash payments totaling approximately $40,000.  (Id.
Counts 1-20, at 22)  In addition to treating De Castro to "numerous
lavish meals" and "various nights of lodging" in the Dominican

Republic, the indictment states that Persons 9 and 10 treated De Castro to "at least one flight on a private airplane."  (Id. Counts 1-20, at 23)  The grand jury further alleges that Person 10 discussed a legal matter with De Castro concerning the renewal of a contract held for a parking facility by Persons 9 and 10 at a government owned and operated facility.  (Id. Counts 1-20)  Based on this conversation, De Castro (and others) presented a Senate Resolution on March 31, 2008 calling for an investigation of the proposed privatization by the government of the parking facility and its potential negative impact upon the Puerto Rican consumer. (Id. Counts 1-20)  It is further alleged that on or about August 19, 2008, De Castro instructed his assistant to deliver a message to Person 9 and others stating that if they did not help, then "he would see them after the upcoming elections[.]"  (Id. Counts 1-20) Person 9 later allegedly advised De Castro that he was "gathering the monthly payment" and that he should not be angry.  (Id. Counts 1-20)  The gist of De Castro's response to Person 9 allegedly was that "he was not angry, but that things were tough and he needed help from his friends."  (Id. Counts 1-20, at 24)

During October, 2008, the government provided De Castro with discovery, including its designation of evidence, which contains information relating to Persons 7, 9 and 10 (as well as to the other individuals identified by number or not referenced by name in the indictment).  This information is reflected in a filing made by

De Castro on November 9, 2008 in which he requested <u>Kyles</u> and <u>Brady</u>
information.[3]  (Docket No. 66)  In his motion, De Castro identified
Persons 7, 9, and 10 as Orlando Mayendia, Rolando Cabral and Miguel
Cabral based "upon information and belief."  (<u>Id</u>. at 6-8)

    In his November 9 motion, De Castro referenced an August 25,
2008 meeting between Mayendia and the FBI in which Mayendia
reportedly said that De Castro "is a great friend."  (<u>Id</u>. at 6)  In
the same motion, De Castro referenced Mayendia's testimony before
the grand jury on September 9, 2008, in which he reportedly said
that he made donations to De Castro, not payments.  (<u>Id</u>.)  De
Castro also referenced meetings between the Cabral brothers and the
FBI.  Specifically, De Castro stated that Rolando Cabral allegedly
sought De Castro's help in regards to the renewal of a parking
contract "at the airport," a fact omitted from the indictment.
(<u>Id</u>. at 7)  De Castro added that Rolando Cabral met with the FBI on
August 28, 2008 and told the FBI that he never asked De Castro for
assistance nor told him that he was having problems at the airport.
(<u>Id</u>. at 7-8)  Miguel Cabral met with the FBI on September 5 and 11,
2008, according to De Castro's motion, at which time he denied
providing De Castro with money or asking him for any favors.  (<u>Id</u>.
at 8)

---

    [3] By naming each of the persons referenced by number in the
indictment in a brief that was not filed under seal, De Castro
violated the protective order that had been issued at his request
in conjunction with the government.  (Docket Nos. 22 and 88)

### III. Discussion

A person who has been released, as De Castro was, under 18 U.S.C. § 3142, and who has violated a condition of his release is subject to revocation of release, an order of detention, and prosecution for contempt of court.  18 U.S.C. §3148(a).  On December 3, 2008, the government and the Probation Officer requested that the Court issue a warrant for De Castro's arrest and to revoke his release.  (Docket Nos. 117 and 118)  The following day the Court held a bail revocation hearing in which the government presented evidence of violations of a condition of the bail order and both parties presented oral argument.  (Docket Nos. 126 and 127)  At the end of the hearing, the Court revoked De Castro's release pursuant to 18 U.S.C. §3148(b), finding clear and convincing evidence that De Castro violated a condition of release and finding that De Castro was unlikely to abide by any condition or combination of conditions of release because De Castro repeatedly violated condition 7(j) after he was warned by the Court to refrain from such conduct.  See 18 U.S.C. § 3148(b)(1)(B) and (b)(2)(B).  The Court did not exercise its discretion under 18 U.S.C. §3148(c) to commence a prosecution for contempt.

The prohibition of contacts with victims or persons who are or may be witnesses is, logically, prophylactic.  It is predicated on the Court's inherent power to protect victims and witnesses.  It seeks to prevent a defendant from intimidating someone who, by

nature of being a victim or a potential witness, is already in a difficult and delicate position.  Some of the reasons that contacts are prohibited are that they may induce victims and potential witnesses to commit crimes, or enable the defendant to commit further crimes.  Contacts also may be used to obstruct justice, to communicate threats, albeit they thickly veiled, against witnesses, or to tamper with witnesses by inducing others to lie or to alter or revise their recollections of the events alleged in the indictment.

Any improper contact with victims or potential witnesses inherently creates a potential for implied intimidation, if not overt threats, the taint of which cannot be easily overcome. Contacts are allowed with the attorney present, of course, to minimize the possibility of intimidation or improper influence while permitting a defendant to prepare his defense.

These possibilities are increased exponentially in this case. De Castro is a politically powerful Senator, Chairman of the Judiciary and Rules and Calendar Committees, from which positions he can exert his power over others who became his extortion victims, as is alleged in the Indictment.  Moreover, the Indictment is replete with allegations of De Castro using indirect and subtle methods of communication to influence extortion victims and potential witnesses in this case.

Even though there is no evidence at this point as to any witness tampering or obstruction of justice, De Castro has already

contacted victims or potential witnesses on four occasions. To the Court, that is clear and convincing evidence that De Castro is unlikely to abide by any condition or combination of conditions of release, especially condition 7(j) prohibiting contacts with victims or potential witnesses. The Court does not take this decision lightly. The purpose of any order releasing a defendant pending trial is to allow the defendant to benefit from the presumption of innocence while reasonably assuring that the defendant will appear as required, to ensure the safety of any person or the community, and to protect the integrity of the pending trial. Cognizant of the factors to be weighed in a pretrial release situation, after the first violation the Court put De Castro on notice that his misconduct had been detected and that future misconduct would engender a stronger response from the Court. Given that De Castro violated the same provision again and on three different occasions, while doing so in a manner (the use of his wife) suggestive of an intent to by pass the condition of release covertly, the Court cannot conclude that a second mild response to De Castro's transgressions will likely prove effective. De Castro's disregard for the Court's order setting conditions of release justifies the Court's conclusion that no condition of release would restrain him from attempts to undermine the integrity of the pending trial.

At oral argument,[4] defense counsel conceded that the contact between De Castro and Ayala on October 31, 2008 violated provision 7(j) of the release order.  (Tr. 33)  Counsel argued, however, that the subsequent contacts between Delgado and extortion victims and potential witnesses (Mayendia and the Cabral brothers) did not constitute indirect contact with potential witnesses, as prohibited by condition 7(j), because Delgado did not say she was calling "on behalf of" her husband.  Counsel argued that even assuming that the contact by Delgado constituted prohibited contact under condition 7(j), De Castro could not have known that Mayendia and the Cabral brothers were potential witnesses in the case.  These arguments will be addressed sequentially.

The second, third and fourth contacts with persons who are victims and potential witnesses which were placed into evidence by the government were made by De Castro's wife, not De Castro; nowhere in the record does it show that the victims and potential witnesses reported Delgado as saying that she called "on behalf of her husband."  The fact that Delgado did not explicitly state that she was calling on her husband's behalf, however, is not dispositive of the issue.  Mayendia testified that he has known De Castro for over 20 years and that he attended the marriage of De Castro and Delgado.  Nevertheless, Mayendia stated that Delgado's

_____

[4]  The defense did not put on any evidence at the hearing.  In fact, none of the witnesses presented by the government was cross-examined.

call to him was the first time that she had ever asked him for help.  Taking into account that Delgado had never before asked for money or "help," and that Mayendia reported her as saying "we are having some problems, to see if you could help us" (emphasis supplied), the Court finds that Delgado was indeed calling on behalf of her husband, which constitutes impermissible indirect contact pursuant to 7(j) of the release order.  This finding is strengthened by Special Agent Marchand's testimony that Rolando Cabral told him that Delgado called him, identified herself as De Castro's wife, and then said she was calling to see if Rolando "could help them" finance the legal fees in De Castro's case.  (Tr. 16) (emphasis supplied)  Again, the Court believes that the common understanding of the statements attributed to Delgado is that she was calling on behalf of her husband.  If she were calling her husband's friends or contacts on her own behalf, it seems more natural to the Court for her to have made this clear to the people she called.

Having found that the calls by Delgado constitute indirect communication by De Castro, the Court must turn to defense counsel's second argument, that De Castro could not have known, or perhaps could not have reasonably discovered, the names of the potential witnesses in this case.  The defense buttresses this argument by saying that the people contacted were friends of De Castro.  (Tr. 31)  None of them, counsel adds, told the FBI or the

Grand Jury that they were extorted.  (Tr. 30)  Moreover, the Court denied De Castro's November 9 motion (for <u>Kyles</u> and <u>Brady</u> information) that named the potential witnesses on the basis of information and belief.  Because the government never confirmed or denied that the individuals named in the brief were indeed the potential witnesses in the case, De Castro could not have known to avoid Mayendia and the Cabral brothers as potential witnesses, or so the argument goes.  Although the Court is certain that he did know their identity, De Castro need not know with complete certainty the identity of all of the government's witnesses in order for him to determine if someone is a victim or a potential witness.

Condition 7(j) prevents De Castro from contacting "any persons [sic] who are or who may become a victim or potential witness" in the investigation or prosecution of the charges filed against him. (Docket No. 13, p. 2)  This condition must be read in context with the indictment and the discovery provided in this case.  The indictment provides specific information that should lead De Castro to the people referenced by number in the indictment.  Other than Mayendia, does De Castro know other co-owners of a bottling and water processing plant in San Juan, Puerto Rico on whose behalf he submitted an amendment to a bill as recently as June 18, 2008? Similarly, does De Castro know anyone other than the Cabral brothers who can be described as co-owners of an island-wide

parking service company, with whom he has shared expensive dinners in the Dominican Republic, and whose business could be impacted by the outcome of an investigation into the privatization of a government-owned parking facility at the airport proposed by De Castro in a bill on March 31, 2008?  It seems exceedingly unlikely that the people described as Persons 7, 9, and 10 could be anyone other than exactly who De Castro said they were in his November 9 filing, on the basis of what De Castro terms information and belief.  A person whose name De Castro knows, even upon information and belief, to be listed in the indictment is surely someone who is or <u>may become</u> a potential witness in the case, and who De Castro should avoid contacting unless accompanied by his lawyer.  Detailed allegations, such as those found in the indictment in this case, are sufficient for a defendant to ascertain the identity of those individuals named in the indictment unless the allegations contain serious inaccuracies, a point which has not been argued before the Court.

In addition to the detailed allegations in the Indictment, the government provided De Castro with discovery and its declaration of evidence by the end of October.  This package of information contained excerpts of testimony before the Grand Jury and interviews with the FBI done by Mayendia and the Cabral brothers. De Castro cited this evidence in his November 9 motion.  This evidence, that Mayendia and the Cabral brothers had been

interviewed by the FBI and, in Mayendia's case, also testified
before the Grand Jury, was sufficient to put De Castro on notice
that Mayendia and the Cabral brothers were or could become
witnesses.  It matters not that all three persons may have denied
providing improper payments in return for favors.  That does not
make their testimony irrelevant or not at all valuable to the
government's case.  The important point is that contact was made
with persons who are alleged to be extortion victims or who are or
could become witnesses.  Accordingly, the Court finds that De
Castro was aware that Mayendia and the Cabral brothers were or
could become witnesses.

        One final point.  Counsel argued that a sanction short of
revocation would be sufficient to insure that De Castro would not
violate any of his conditions of release in the future, such as
"house arrest at all times" (Tr. 36), "admonish[ment] of De
Castro's wife and every single person who is close to him, okay,
and make it public here from the Court's stand [sic] that no
contact can be had" (Tr. 37), or admonishment [sic] De Castro that
if it again happens . . . the Court will find him in contempt and
he will go to jail whatever time the Court deems or until the case
is over (Tr. 38).  The problems with this argument is that although
home detention and electronic monitoring may replicate a detention
facility, it does not have the confidence of security that a
detention facility instills.  There is a telephone in De Castro's

home; additionally, De Castro and his wife have cellphones.  All
these telephones can be used regularly to circumvent court orders.
See, United States v. La Fontaine, 210 F.3d 125, 135 (2d Cir.
2000).  Furthermore, there is no reason to wait for a fifth
violation of a condition of release when four have already
occurred, three of them after De Castro was told that he had
violated the condition.

     Having addressed the principal objections raised by defense
counsel, the Court shall summarize the basis for its ruling.  The
Court finds by clear and convincing evidence that De Castro
violated section 7(j) on four separate occasions, by communicating
directly with Ayala, and then indirectly (by means of his wife)
with Mayendia and each of the two Cabral brothers.  Because the
indirect contacts with Mayendia and the Cabral brothers occurred
after De Castro was put on notice of his first violation (the
communication with Ayala), the Court finds that De Castro is
unlikely to abide by any condition or combination of conditions of
release.  Contrary to the argument raised by De Castro in the
hearing, he was not caught in a "catch 22" situation.  The
indictment and the discovery provided De Castro with a clear idea
of the persons who are alleged to be his extortion victims or who
are or could become witnesses in the case (see Docket No. 66) (even
upon information and belief) and he was not barred from speaking to
them altogether.  He only had to do so with his lawyer present, as

Civil No. 08-337 (FAB)                                                     18

he did in his second conversation with Ayala on October 31, 2008, which suggests that he personally understood the restriction contained in section 7(j) of the release order.  Rather than carefully ensuring that he would in no way violate this provision again, perhaps by communicating with potential witnesses with counsel present, he prevailed upon his wife to call on his behalf. In doing so, De Castro himself demonstrates to the Court that he cannot be trusted to comply with provision 7(j) of the release order in the future.

### IV.  Conclusion

For the reasons discussed above, the Court revoked De Castro's release and ordered him detained on December 4, 2008.

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, December 10, 2008.

s/ Francisco A. Besosa
FRANCISCO A. BESOSA
United States District Judge